[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
REPORT OF ATTORNEY REFEREE
FINDINGS OF FACT
Based upon the testimony presented, a review of all of the exhibits, and the credibility of the witnesses, the following findings are made:
1. On February 22, 1989, the plaintiff and the defendants entered into a Sale and Purchase Agreement ("Agreement") by which the defendants agreed to sell and the plaintiff agreed to buy the property located at 35 Beaver Brook Road, Lyme, Connecticut (the "Property").
2. The purchase price under the Agreement was $340,000, and the closing date was May 1, 1989.
3. Pursuant to the Agreement the plaintiff deposited the sum of $1,000.
4. The Agreement provided for an additional deposit of $33,000 to be paid on or before March 3, 1989.
5. Under the terms of the Agreement the deposits would be deducted from the final purchase price at the time of the closing or would be returned to the plaintiff if he was entitled to terminate the Agreement.
6. The Agreement provided that the plaintiff was entitled to have structural, mechanical and wood destroying insect inspections conducted.
7. The Agreement further provided as follows:
 If such tests and/or inspections are unsatisfactory to the Buyers, they shall notify the Seller's agent to that effect in writing within 5 business days after the inspection . . . If the Sellers are unwillingCT Page 6444 or unable to correct the problem(s) adequately, Buyers may cancel this contract. . . and all sums paid by Buyers on account hereof shall be returned forthwith.
8. On or about February 23, 1989, one Joseph Till inspected the property on behalf of the plaintiff.
9. Mr. Till's report noted the following deficiencies:
 (a) Undercutting of some crawl area stone walls should be corrected by removal of all loose dirt and or stone. Concrete should [be] installed so the support of the wall will be retained by being on firm footing [to prevent dropping of the support wall].
 (b) Crawl areas all need additional ventilation to correct the moisture problem . . . The insulation needs to be changed.
 (c) Dirt floors should have cement skim coat to lock out moisture.
(d) Seal the stone chimney with some cement sealer.
(e) The Water storage tank has a leak.
(f) Slider had a bebe hole in the glass.
(g) The doorsill has a crack.
(h) Some rotted deck boards need replacement.
(i) Some single glass windows do not have storms.
(j) Some areas lack gutters.
10. The plaintiff sent the Till report to the real estate broker with whom he was dealing, Janet Duncan, who in turn forwarded it to the listing real estate broker, Lynn Greenho, who in turn forwarded it to the defendants.
11. The defendants authorized both brokers to obtain estimates of the cost to correct the problems set forth in the Till CT Page 6445 report.
12. The defendants took steps to correct some of the problems, i.e. the water storage tank was replaced; insulation and gutter problems were fixed; ventilation screens were put in the existing windows; and inasmuch as the wood destroying insect inspection report recommended treatment for carpenter ants, the defendants arranged for that treatment.
13. On March 2, 1989, one day before the additional $33,000 deposit was due, the plaintiff requested a two week extension for payment of same.
14. The defendants agreed to extend the date for payment of the $33,000 to March 17, 1989.
15. The plaintiff requested the extension because he was going to Europe.
16. The defendants, through the brokers, continued to obtain estimates of the costs of correcting the deficiencies contained in the Till report.
17. During the two weeks the plaintiff was in Europe he did not contact the defendants, the brokers, or the contractors.
18. The plaintiff did not pay the $33,000 deposit on March 17, 1989, the agreed upon extension date.
19. On March 21, 1989, the plaintiff, in writing, advised Janet Duncan, one of the brokers, that he was canceling the Agreement as the house would not "satisfy his short term interest".
20. On March 28, 1989, one week later, Ms. Duncan, the broker with whom the plaintiff was dealing, drafted and typed a letter for his signature purporting to set forth some legal justification for the cancellation of the contract and, further, offering to renegotiate the purchase price for some $65,000 less than the price previously agreed upon.
21. All of the deficiencies set forth in the Till report were correctable.
22. Although the defendants at one point suggested a $7,500 escrow to cover repair costs, they never indicated a refusal to CT Page 6446 correct the problems set forth in the Till report.
23. The plaintiff's failure to pay the second deposit of $33,000 on March 17, 1989 was a material breach of the Agreement.
24. Additionally, the plaintiff wrongfully repudiated the Agreement on March 21, 1989.
25. The Agreement contained a liquidated damages clause which read as follows:
 If the said BUYER shall fail to make the several payments, or any of them, as herein provided, he shall forfeit, as liquidated damages to the SELLER, all claims to the premises described herein and to all the monies by him paid in pursuance of this Agreement. This provision, however, shall in no way affect the rights of either party to enforce the specific performance of this Agreement, or of proceeding with any other remedies available to them at law or in equity.
26. Despite continuing good faith efforts, the defendants have been unable to date to sell the property.
27. The defendants offered evidence of consequential damages from May 1, 1989 through December 31, 1990 in the amount of $69,007.
28. Inasmuch as there was no indication that the liquidated damages clause was invalid that clause controls the issue of damages.
29. The liquidated damages clause defines the amount of damages as "all the monies by him paid in pursuance of this agreement". Since the plaintiff had paid $1,000 that sum is the amount of liquidated damages.
30. In the event that the Court should disagree with the Attorney Trial Referee's recommendation and conclude that the defendants are entitled to consequential damages, it is specifically found that the amount of consequential damages would be the sum of $24,125.
RECOMMENDATION
CT Page 6447
It is recommended that judgment enter in favor of the defendants on the Complaint. It is further recommended that the defendants are entitled to $1,000 liquidated damages on the Counterclaim but since they have already been paid that sum judgment enters for the plaintiff.
Wayne G. Tillinghast Attorney Referee